IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CATHERINE DOUGHERTY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 08-814-GMS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM

### I.   INTRODUCTION

On October 30, 2008, plaintiff Catherine E. Dougherty ("Dougherty") filed this appeal

from the ALJ's decision denying her claim for Social Security disability insurance benefits.[1]

(D.I. 1.)  Presently before the court are the parties' cross-motions for summary judgment. (D.I.

13, 18.)  For the reasons that follow, the court will: (1) grant in part and deny in part the

plaintiff's motion for summary judgment, (2) deny the defendant's motion for summary

judgment without prejudice, (3) vacate the ALJ's decision, and (4) remand this matter to the ALJ

for further proceedings consistent with this memorandum opinion.

### II.   BACKGROUND

On April 27, 2005, Dougherty protectively filed her application for a period of disability

and Disability Insurance Benefits ("DIB"), alleging disability beginning February 24, 2005 due to

---

[1] Administrative Law Judge Melvin D. Benitz (the "ALJ") issued a written decision
denying the plaintiff's claim for disability benefits on February 23, 2008 (the "ALJ's decision").
(D.I. 10 at 7-16.)

"chronic infection/leg injuries/chronic staph infection."[2] (D.I. 10 at 7, 107-11, 129-40.)

Following the Social Security Administration's ("SSA") denial of her claim, both initially and upon reconsideration, Dougherty requested a hearing before the ALJ. (*Id.* at 7.) Pursuant to that request, on December 11, 2007, the ALJ held a hearing on Dougherty's claim.[3] (*Id.*) At the hearing, the ALJ heard testimony from Dougherty and an impartial vocational expert, Dr. James M. Ryan (the "vocational expert"), regarding Dougherty's claim for benefits.[4] (*Id.* at 43-48.) On February 23, 2008, the ALJ issued a written decision denying Dougherty's claim for DIB. (*Id.* at 7-16.) The ALJ concluded that Dougherty was "not disabled under sections 216(j) and 223(d) of the Social Security Act" and, therefore, was not entitled to disability insurance benefits. (*Id.* at 16.) The appeals council subsequently denied Dougherty's request for review. On October 30, 2008, Dougherty filed the instant appeal in this court.

## A.     Medical Evidence

The court summarizes the relevant medical evidence of record in this case as follows.

In 1996, Dougherty sustained bilateral hip/femur fractures as the result of a car accident and underwent reconstructive surgeries with rod implantations in both legs. (*Id.* at 372-73.) Dougherty returned to work following this treatment. (*Id.* at 23.) On November 10, 2004, and

---

[2] Dougherty was 33 years old when she originally filed her claim for disability insurance benefits. (D.I. 10 at 15.) She was born on October 4, 1971, and graduated from high school in 1989. (*Id.* at 15, 138-39.) From 1993 to 2005, Dougherty worked as a bartender/waitress and as an administrative assistant for various car dealerships. (*Id.* at 118-24.)

[3] By the time of the hearing, Dougherty also alleged inability to work due to degenerative disc disease and depression.

[4] At the hearing, Dougherty was represented by her attorney, Michael Goodrich, Esq. (D.I. 10 at 19.)

December 13, 2004, Dougherty had the right and left rods, respectively, removed. (*Id.* at 220-24.)

On February 24, 2005, Dougherty was admitted to the hospital for an infection in her left hip wound from her rod-removal surgery. (*Id.* at 416-18.) When admitted, Dougherty was unable to bear weight on her left lower extremity and her left hip wound oozed drainage. (*Id.* at 416.) James Ley, M.D., an infectious disease specialist, prescribed antibiotics for Dougherty's infection. (*Id.* at 417.) Elliott H. Leitman, M.D. performed an incision and drainage of Dougherty's left hip. (*Id.* at 417.) Dougherty was discharged on March 1, 2005 and instructed to follow-up with Dr. Ley; Keith Sokoloff, D.O., her primary care physician; and Dr. Leitman. (*Id.*) Dougherty sought hospital treatment again in March for this wound. (*Id.* at 441-42.) Subsequently, Dougherty received in-home treatment from a visiting nurse association. (*Id.* at 475-597.) On May 16, 2005, Abdullah Malek, M.D. performed surgery to excise and close the wound on Dougherty's left hip. (*Id.* at 612-13.)

On August 25, 2005, Vinod Kataria, M.D., a state agency physician, reviewed Dougherty's file and completed a physical residual functional capacity assessment. Dr. Kataria opined that Dougherty was capable of frequently lifting and/or carrying ten pounds; standing and/or walking for a total of at least two hours in an eight-hour workday; sitting for a total of about six hours in an eight-hour workday; performing unlimited pushing and pulling; and occasionally performing postural activities, but never climbing ladders, ropes, or scaffolds. (*Id.* at 659-61.) Dr. Kataria further opined that Dougherty had no manipulative, visual, or communicative limitations and that she should avoid concentrated exposure to extreme cold, vibrations, and hazards, such as machinery and heights. (*Id.* at 662-63.) Dr. Kataria also

3

indicated that the file he reviewed contained no treating or examining source statement regarding Dougherty's physical capacities. (*Id.* at 665.)

On September 23, 2005, Dougherty sought treatment for an infection in her right hip wound. (*Id.* at 672.) She was admitted to the hospital with severe right hip pain and back pain. (*Id.*) Dougherty had MRI of the spine and MRI of the back done, which showed some disk bulge in the lumbar spine. (*Id.*) For the right hip infection, Dougherty was treated with antibiotics; the wound culture showed staph infection. (*Id.*) Dougherty was discharged on September 30, 2005 with instructions to follow-up with Dr. Ley and Dr. Malek. On October 7, 2005, Dr. Malek referred Dougherty to Dr. Leitman for evaluation of her hip infection. (*Id.* at 742.) On October 17, 2005, Dr. Leitman noted no sign of infection and that Dr. Malek had recently closed the right hip wound. (*Id.* at 757.) Dougherty was later treated for recurrent skin infections. (*Id.* at 815-17.) On December 11, 2007, Dougherty testified that she had not had any infections in more than a year. (*Id.* at 36, 39.)

Dougherty began experiencing low back pain and sacroiliac joint pain in January 2005. (*Id.* at 796.) She has since received extensive treatment for her secondary lumbar problems, which include herniated disks, osteoarthritis, and lumbar facet syndrome. (*Id.* at 830.) By May 2006, Bruce Gossinger, D.O., Dougherty's treating pain management specialist, had administered three bilateral sacroiliac injections to combat Dougherty's lumbar area pain.[5] (*Id.* at 798.) In August and September 2006, Dr. Gossinger administered three lumbar epidural injections. (*Id.* at 789, 871-72, 876-77.) In April 2007, Dougherty received two lumbar facet

---

[5] Dr. Gossinger is a treating specialist who is board certified in psychiatry, neurology, electrodiagnostic medicine, independent medical examination, and pain medicine.

injections. (*Id.* at 852-53, 858-59.) In June 2007, Dougherty received one radiofrequency ablation of the lumbar facet joints. (*Id.* at 836.) By September 2007, Dougherty's pain medications included Oxycontin (a narcotic pain medication), Oxycontin IR (instant release), Ambien (a sedative), Lyrica (a neuropathic pain medication), and Prozac (an anti-depressant). (*Id.* at 829.)

On October 26, 2007, at the request of Dougherty's attorney, Dr. Gossinger completed a form regarding Dougherty's ability to do work activities. (*Id.* at 824-28.) Dr. Gossinger opined that Dougherty could frequently lift and carry ten pounds; could stand and walk for less than two hours of an eight hour day; could sit for about three hours in an eight hour day; could sit for only ten minutes before having to change position; and could stand for only five minutes before changing position. (Id. at 825-26.) Dr. Gossinger further opined that Dougherty must walk around every ten minutes, but could do so for only five minutes at a time; must have the opportunity to shift at will from sitting or standing/walking; and must lie down at unpredictable intervals during a work shift, most likely every hour and a half. (*Id.* at 826.) Additionally, according to Dr. Gossinger, Dougherty could occasionally climb stairs but could never twist, stoop (bend), crouch, or climb ladders; experienced increased pain when reaching, pushing, or pulling; had to avoid extreme cold, heat, and high humidity; and would have to miss work more than three times a month due to her impairments. (*Id.* at 827-29.)

**B.    Hearing Testimony**

1.    Catherine Dougherty's Testimony

At the December 11, 2007 hearing before the ALJ, Dougherty testified about her background, the nature of her claim for disability insurance benefits, and the course and extent of

her medical treatment. (*Id.* at 19-49.) Specifically, Dougherty testified that she has artificial hips in both hips, had rods in both legs, has plates in the right side of her face, and faces issues with her hip wounds, infections, back problems, and her concomitant medications. (*Id.* at 22-28.) Dougherty claims that she has been unable to return to work since February 24, 2005. (*Id.* at 19.)

Dougherty testified that she developed staph infection after the rods were removed from her legs, and that she still faces issues with infection. (*Id.* at 23-24, 41.) Dougherty described the surgical procedures she underwent to treat her infections and explained the monthly bloodwork she undergoes to monitor her infection level. (*Id.* at 41.) Dougherty stated that in the year prior to the hearing, her infection level remained at medium, which often caused her to experience flu-like symptoms. (*Id.*) With regard to her back problems, Dougherty complained of constant throbbing pain from the middle of her back down through her leg. (*Id.* at 24-25.) Dougherty testified that her pain medications make her feel "real weird" and "woozy," cause her to have trouble standing up and driving, disturb her appetite and sleep patterns, and interfere with her concentration. (*Id.* at 26-31.) Dougherty went on to explain that she had monthly, if not bi-weekly, appointments with Dr. Grossinger, for treatment of her "back, hips, and whole situation," and that she had monthly or bi-monthly appointments with Dr. Sokoloff, for treatment of her "chemical imbalance and anxiety." (*Id.* at 33-35.)

In describing her daily activities, Dougherty testified that she tries to help out around the house by doing daily chores such as cleaning and laundry, but that she is very limited by headaches and her pain medications. (*Id.* at 28-33.) Dougherty explained that she is unable to dust or vacuum but can fold laundry while seated. (*Id.* 29-30.) Dougherty claimed that she is unable to go grocery shopping, do lawn work, or garden–duties her husband and father-in-law

6

have adopted. (*Id.* at 30.) Dougherty further provided that she goes out of the house once a day to pick up one of her two sons, driving to get him from school; prepares quick lunches each day; goes out to dinner once a month with her husband; is able to walk; and occasionally walks to her next door neighbor's house. (*Id.* at 28-33.)

2.    The Vocational Expert's Testimony

At the same hearing before the ALJ, the vocational expert offered testimony regarding Dougherty's background, skills and limitations, and the number of jobs that exist in the national economy that a person of Dougherty's age, education, and skills may perform. (*Id.* at 43-48.) Specifically, the vocational expert testified that the exertion and skill level of Dougherty's work as a bartender/waitress prior to February 24, 2005 was light and unskilled with a Specific Vocational Preparation ("SVP") of two, and that Dougherty's work as an administrative assistant prior to that same date was at the sedentary exertional level and skilled with an SVP of seven. (*Id.* at 43-44.) In addition, the vocational expert stated that Dougherty's prior work required skills that are transferable to other sedentary work of a clerical and/or bookkeeping nature. (*Id.* at 44.) According to the vocational expert, a hypothetical person, as described by the ALJ, with Dougherty's residual functional capacity, could be employed to undertake sedentary, unskilled occupations. (*Id.* at 45-46.) The vocational expert claimed that Dougherty would be qualified, for example, to work as a receptionist, grading worker, or small parts inserter. (*Id.*) The vocational expert admitted, however, that a hypothetical person with the limitations described in Dr. Gossinger's opinion would be unfit to perform any of those jobs. (*Id.* at 47-48.)

**C.    The ALJ's Findings**

The five step evaluation requires the following sequential analysis:

7

> [The Commissioner] determines first whether an individual is currently engaged
> in substantial gainful activity. If that individual is engaged in substantial gainful
> activity, he will be found not disabled regardless of the medical findings. 20
> C.F.R. § 404.1520(b). If an individual is found not to be engaged in substantial
> gainful activity, the [Commissioner] will determine whether the medical evidence
> indicates that the claimant suffers from a severe impairment. 20 C.F.R. §
> 404.1520(c). If the [Commissioner] determines that the claimant suffers from a
> severe impairment, the [Commissioner] will next determine whether the
> impairment meets or equals a list of impairments in Appendix I of sub-part P of
> Regulations No. 4 of the Code of Regulations. 20 C.F.R. § 404.1520(d). If the
> individual meets or equals the list of impairments, the claimant will be found
> disabled. If he does not, the [Commissioner] must determine if the individual is
> capable of performing his past relevant work considering his severe impairment.
> 20 C.F.R. § 404.1520(e). If the [Commissioner] determines that the individual is
> not capable of performing his past relevant work, then he must determine whether,
> considering the claimant's age, education, past work experience and residual
> functional capacity, he is capable of performing other work which exists in the
> national economy. 20 C.F.R. § 404.1520(f).

*West. v. Astrue*, C.A. No. 07-158, 2009 WL 2611224 (D. Del. August 26, 2009) (citing *Brewster*

*v. Heckler*, 786 F.2d 581, 583–84 (3d Cir. 1986)). Based on the factual evidence and the

testimony of Dougherty and the vocational expert, the ALJ determined that Dougherty was not

disabled, and, therefore, was not entitled to disability insurance benefits. (*Id.* at 16.) The ALJ's

findings are summarized as follows:

> 1. The claimant meets the insured status requirements of the Social Security Act
> through December 31, 2009.
>
> 2. The claimant has not engaged in substantial gainful activity since February 24,
> 2005, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).
>
> 3. The claimant has the following sever impairments: status post effects of bilateral
> fracture of the femurs in 1996; degenerative disc disease; and depression (20 CFR
> 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that
> meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart
> P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

8

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of sedentary work. She can lift/carry a maximum of 10 pounds occasionally and less than 10 pounds frequently. She can stand or sit continuously for 10-15 minutes and requires a sit/stand option. She is precluded from climbing ladders or ropes and must avoid workplace hazards and temperature extremes. She suffers from the effects of bilateral hips fractures which have healed but result in pain and discomfort of a moderate nature. Mentally, she has depression and anxiety of a moderate nature which results in occasional headaches and anxiety attacks that are somewhat relieved by medication.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on October 4, 1971 and was 33 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1560(c), 404.1566 and 404.1568(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 24, 2005 through the date of this decision (20 CFR 202.1520(g)).

(D.I. 10 at 7–16.)

## III.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the court must review the record as a whole and "draw all reasonable inferences in favor of the nonmoving party, [but] may not make credibility determinations or weigh the evidence." *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). If the court determines that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

## B.     Review of the ALJ's Findings

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. § 405(g), 1383(c)(3).  Substantial evidence is not a "large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (internal citation omitted). *See also Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (defining substantial evidence as "more than a mere scintilla") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Credibility determinations are, likewise, the province of the ALJ, and should be disturbed on review only if they are not supported by substantial evidence. *See Pysher v. Apfel*, No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)).  Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the ALJ's conclusion was reasonable.  In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v. Sec. of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.     DISCUSSION

### A. The Treating Physician's Opinion

After having considered the record in this case, the parties' submissions and arguments,

10

and the applicable law, the court concludes that the ALJ's decision is not supported by substantial evidence in the record. Specifically, the court finds that the ALJ failed to accord proper weight to the medical opinion of Dougherty's treating physician. The court will, therefore, (1) grant in part and deny in part the plaintiff's motion for summary judgment, (2) deny the defendant's cross-motion for summary judgment, (3) vacate the ALJ's decision, and (4) remand this matter to the ALJ for further proceedings.[6]

In determining the proper weight to be given to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson*, 402 U.S. at 399. In particular, regarding the weight given to a treating physician's medical opinion, the Third Circuit has stated that "treating physicians reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 348, 350 (3d Cir. 1987)). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). Indeed, a treating physician's opinion is accorded

---

[6] Because this matter is being remanded due to the ALJ's failure to accord proper weight to the opinion of Dougherty's treating physician, and on remand the ALJ may ultimately reach different conclusions regarding Dougherty's condition, as well as the credibility of Dougherty's testimony and Dougherty's residual functional capacity, the court need not, at this point, address whether the ALJ properly presented Dougherty's residual function capacity in a hypothetical to the vocational expert, or whether the vocational expert properly identified jobs existing in significant numbers in the national economy that Dougherty could perform. The court will, however, address whether the ALJ erred in his evaluation of (a) Dougherty's infections; (b) the effectiveness and side effects of Dougherty's medication; and (c) Dougherty's alleged mental impairments. *See infra* Parts IV.B.-D.

11

"controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001) (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ, however, may reject a treating physician's opinion if it is based on "contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). In those instances, "[e]ven where there is contradictory medical evidence, . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008); *see also* Social Security Regulation ("S.S.R.") 96-2p, 1996 SSR LEXIS 9, at *9-*10 (July 2, 1996) (noting that "a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

Here, the court finds that the ALJ failed to accord proper weight to the medical opinion and assessment of Dougherty's treating physician, Dr. Gossinger. Specifically, in rejecting Dr. Gossinger's opinion, the ALJ found that Dr. Gossinger's medical opinion was not supported by Dr. Gossinger's own treatment records. (D.I. 10 at 14.) The ALJ found that Dr. Gossinger's October 26, 2007 opinion contained "dramatic limitations" that were contrary to the record's "relatively benign objective findings; the limited degree and conservative nature of the treatment [Dougherty] ha[d] received; her level of activities of daily living; and the opinion of the State agency disability consultant." (*Id.*) The ALJ's findings, however, are not supported by substantial evidence in the record.

First, the court is neither convinced that Dr. Gossinger's opinion contains "dramatic

12

limitations" which contradict the evidence of record nor persuaded that the record reflects only

"relatively benign objective findings." Both the ALJ and the defendant assert that Dr.

Gossinger's opinion may be rejected because it is inconsistent with his own treatment notes,

which the ALJ opines "demonstrate good response to treatment with noted reduction in pain."

(*Id.* at 14.) The Third Circuit has cautioned, however, that "a doctor's observation that a patient

is 'stable and well controlled with medication' during treatment does not [necessarily] support

the medical conclusion that [the patient] can return to work."[7] *Brownawell v. Comm'r of Soc.*

*Sec.*, 554 F.3d 352, 356 (3d Cir. 2008) (alterations in original) (internal quotations omitted).

Thus, contrary to the ALJ and the defendant's assertions, Dr. Gossinger's opinion concerning

Dougherty's physical limitations and capacity for work is not necessarily contradicted by his own

notes that Dougherty's treatment "yielded some excellent initial results" and that Dougherty

reported "significant relief" from pain. (D.I. 10 at 829.) Further, the record reflects support for

Dr. Gossinger's opinion. Indeed, Dr. Gossinger's treatment notes from his two-year treating

---

[7] The relevant portion of the passage in *Brownawell* from which this sentence is quoted provides:

> It is clear that Brownawell's treating physician considered her to be disabled . . . .
> The ALJ rejected [the treating physician]'s assertions of disability because he
> considered them "inconsistent with and unsupported by [the treating physician]'s
> longitudinal treatment notes and the record as a whole." In support of this decision,
> the ALJ emphasizes the fact that [the treating physician] "consistently reported in his
> treatment and progress notes, before and after the date of the opinion, that the
> headaches were stable and under control as they respond very well to [medication]."
> This Court has noted, however, that a doctor's observation that a patient is "'stable
> and well controlled with medication' during treatment does not [necessarily] support
> the medical conclusion that [the patient] can return to work." *Morales*, 225 F.3d at
> 319.

*Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355-56 (3d Cir. 2008) (internal citations
omitted).

13

relationship with Dougherty indicate that Dougherty suffered from a number of physical impairments, including, among other things, weakness, nerve root tension, muscle spasms and tenderness, gait disturbance, and pain. (*Id.* at 865.) Moreover, it is evident from Dr. Gossinger's notes that, due to the severity of her condition, Dougherty required the full battery of treatment options, including physical therapy, epidural injections, medications, and referrals to specialists in the field. One of the additional therapists to whom Dr. Gossinger referred Dougherty (1) noted that Dougherty's daily living, work-related, and recreational activities aggravated her symptoms and limited her physically and (2) found that Dougherty's "lumbar range of motion was severely restricted and painful in extension." (*Id.* at 796). During his treatment of Dougherty, Dr. Gossinger performed at least seven neurosurgical outpatient procedures in an attempt to relieve Dougherty's pain. (Id. at 789-90, 798-90, 836-37, 852-53, 858-59, 871-72, 876-77.) Despite the initial successes of such procedures in alleviating some of her pain, as of September 14, 2007, Dougherty's medications continued to include multiple pain medications (Oxycontin, Oxycontin IR, and Lyrica), an anti-depressant (Prozac), and a sedative for sleep (Ambien). Dr. Gossinger rendered his opinion regarding Dougherty's physical limitations and capacity for work just over one month past that date. Finally, the ALJ himself found that Dougherty was severely impaired by, among other things, degenerative disc disease. (*Id.* at 9.)

Second, it is the court's opinion that the ALJ erred in rejecting Dr. Gossinger's opinion as contradictory to the evidence of Dougherty's activities of daily living. In his decision, the ALJ provided the following:

> The claimant's allegations are further undermined by statements she has made concerning her functional abilities and activities of daily living. For example, the claimant care [sic] for 2 small children, independently manages her personal

14

> hygiene, drives a car and takes walks . . . . These statements indicate that the
> claimant retains the exertional capacity for at least a significant range of sedentary
> work.

(*Id.* at 14.) For the most part, Dougherty does independently manage her personal hygiene.

According to reports Dougherty filed with the SSA, however, Dougherty's husband has to help

her with her shoes and socks and with getting into and out of the bathtub. (*Id.* at 174.) With

regard to caring for her two sons, Dougherty has reported her belief that she is unable to care for

her young children because she requires assistance accomplishing simple tasks. (*Id.* at 170.)

Dougherty has also indicated that she relinquished primary cooking responsibilities to her

husband and only prepares quick meals because she cannot stand long. (*Id.* at 175.) Further,

before the ALJ, Dougherty testified that she receives help from her father-in-law in caring for her

children and does no household chore aside from folding laundry while seated. (*Id.* at 29-30.)

As for driving, Dougherty testified that she has to drive each day to pick up one of her children

from school because bus service from that school is unavailable. (*Id.* at 30-31.) Dougherty

stated that she is afraid to drive because her doctors and medications warned her not to. (*Id.* at

30.) With regard to walking, Dougherty testified that she never walks around the block, to the

grocery store, or through her neighborhood, and that she only occasionally walks to her next door

neighbor's house because she is afraid she will be unable to return to her house. (*Id.* at 32.) For

these reasons, the court is not convinced that the ALJ accurately characterized Dougherty's

activities of daily living when he cited such as a basis for rejecting Dr. Grossinger's opinion.

The court recognizes that the ALJ was entitled to, and did, determine that Dougherty's testimony

concerning the intensity, persistence and limiting effects of her symptoms was not entirely

credible. (*Id.* at 13.) The court is also cognizant of its obligation to avoid second-guessing such

15

credibility judgments. The court notes, however, that it is improper for an ALJ to disregard a treating physician's medical opinion based solely on his own impression of the record and his evaluation of a claimant's credibility. *See Morales v. Apfel*, 225 F.3d 310, 318 (3rd Cir. 2000) ("The ALJ cannot, as he did here, disregard [a treating physician's] medical opinion based solely on his own amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility.") (internal quotation omitted) (second alteration in original). The court finds that the ALJ so erred in this case.

Third, it is the court's opinion that the ALJ erred in rejecting Dr. Gossinger's opinion as contradictory to the opinion of Dr. Kataria, the State agency disability consultant. Dr. Kataria never met with nor examined Dougherty, and his physical residual functional capacity assessment was rendered on August 25, 2005, long before the record was complete. (D.I. 10 at 658-66.) Thus, Dr. Kataria's opinion pre-dates at least two of Dougherty's hospitalizations for infection-related treatment and all of Dougherty's neurosurgical outpatient procedures. As noted above, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). The scales must tip even more in the treating physician's favor when the non-treating physician's opinion is rendered without the benefit of a complete record. *Cf. Morales*, 225 F.3d at 319-20.

For the above reasons, the court finds that the ALJ failed to accord proper weight to the medical opinion and assessment of Dougherty's treating physician. The court therefore concludes that the ALJ's decision is not supported by substantial evidence in the record.

### B. Dougherty's Hip Wound Infections

16

Dougherty contends that the ALJ erred in (1) neglecting to recognize the severity of her chronic infections and (2) failing to find that her need for continuing surgical management of those infections equaled Listing 1.08 of 20 C.F.R. Part 404, Subpart P, Appendix 1. (D.I. 14 at 19.) As explained above, step two of an ALJ's evaluation process requires a determination of whether the medical evidence indicates that the claimant suffers from a severe impairment. Step three requires evaluation of whether a claimant's impairment meets or medically equals the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. For the reasons below, the court finds (1) that the ALJ did in fact recognize the severity of Dougherty's infections and (2) that the ALJ did not err in failing to find that Dougherty's impairments met Listing 1.08.

1.     Recognition of Severity

The ALJ discussed Dougherty's infections throughout his decision. Additionally, the ALJ (a) characterized Dougherty's chronic infections as "status post motor vehicle accident 9 years ago,"[8] referring to the 1996 motor vehicle accident in which Dougherty suffered bilateral fracture of her femurs and (b) expressly found that Dougherty was severely impaired by, among other things, "status post effects of bilateral fracture of the femurs in 1996." (D.I. 10 at 9.) The court agrees with the defendant's assertion that the ALJ's express finding of severe impairment reflects both his recognition and consideration of the severity of Dougherty's infections.

2.     Listing 1.08

In his decision, the ALJ discussed the listings he deemed applicable to Dougherty's case and determined that Dougherty's impairments did not meet those listings. (D.I. 10 at 9-11.) The

---

[8] *See* D.I. 10 at 12 ("[Dougherty's] ability to work is limited by chronic infections/leg injuries; *status post motor vehicle accident 9 years ago* with insertion of medical rods in her legs that were recently removed with recurrent infections and open wounds.") (emphasis added).

ALJ did not discuss whether Dougherty's wound infections met or medically equaled Listing

1.08. Dougherty argues that her wound infections meet that listing because they are a soft tissue

injury, she required continuing surgical management of the infections, and she was not restored

to function within twelve months. (D.I. 14 at 20.) The court is not persuaded by Dougherty's

argument.

> Listing 1.08 states, in relevant part:

> 1.08 *Soft tissue injury (e.g., burns)* of an upper or lower extremity, trunk, or face
> and head, under continuing surgical management, as defined in 1.00M, directed
> toward the salvage or restoration of major function, and such major function was
> not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.08. As previously discussed, Dougherty had rods

removed from her legs in November and December 2004; received treatment for a left hip wound

infection that made her unable to bear weight on her left lower extremity in February 2005;

received treatment for a right hip wound infection that caused her severe hip and back pain in

September 2005; and had the right hip wound closed in October 2005. These treatments

occurred over eleven months, not twelve. Dougherty points out that she suffered from recurrent

infections and open wounds more than a year after her right hip wound was closed. (D.I. 20 at

12.) Specifically, Dougherty cites to an October 25, 2006 report from Dr. Ley reflecting

treatment of a spontaneous lesion in Dougherty's left breast and a December 5, 2006 report from

Gregory Marcotte, M.D., noting continued infections of Dougherty's nail beds and toenail beds.

(*Id.* (citing D.I. 10 at 815-17)) There is no evidence, however, that these infection-related

treatments were directed toward the salvage or restoration of major function. Accordingly, the

court finds no error in the ALJ's failure to discuss whether Dougherty's impairments met or

medically equaled Listing 1.08. *See Jones v. Barnhart*, 364 F.3d 501, 504 (3d Cir. 2004) ("For a claimant to show his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

## C. The Effectiveness and Side Effects of Dougherty's Medication

Dougherty asserts that the ALJ erred in failing to explain how he reconciled his conclusions with the evidence related to the effectiveness and side effects of Dougherty's pain medication. The court finds no error in the ALJ's treatment of such evidence.

As discussed above, Dougherty testified that her pain medications make her feel "real weird" and "woozy," cause her to have trouble standing up and driving, disturb her appetite and sleep patterns, and interfere with her concentration. (D.I. 10 at 26-31.) The ALJ considered these side effects and incorporated them into the hypothetical question posed to the vocational expert. This was done despite the fact that the record contains no medical evidence of any physical limitations resulting from any side effects of medication.[9]

The ALJ instructed the vocational expert to consider only simple, routine, unskilled jobs

---

[9] *See Burns v. Barnhart*, 312 F.3d 113, 130-31 (3d Cir. 2002) (rejecting the argument that the ALJ erred in failing to take into account the impact of the side effects of claimant's medication).

> In rejecting [claimant's] claim that he could not work due to the side effects of the medication he took—namely drowsiness—the ALJ noted that the record contained "no significant complaints of side effects from medication," . . . Likewise, there was no medical evidence as to any physical limitations resulting from any side effects from medication. Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations. Here, there is no such evidence. Thus, the ALJ's decision to discount [claimant's] allegations of side effects was based on substantial evidence.

*Id.*

19

with an SVP of two that are low stress, low concentration, and low memory; and are capable of

being performed by a person with mild-to-moderate limitations maintaining concentration,

persistence, and pace. (*Id.* at 44-45.) By incorporating such limitations into his hypothetical, the

ALJ accounted for the side effects Dougherty allegedly experienced. The court finds no error in

the ALJ's treatment of the alleged side effects of Dougherty's medication.[10]

### D. Dougherty's Mental Impairments

Dougherty contends that the ALJ failed to fulfill his duty to develop the record as it

related to Dougherty's alleged depression and anxiety attacks. Dougherty asserts that the ALJ

directly violated the Social Security Act by failing to procure the "statutorily-mandated mental

health review." D.I. 14 at 24. Dougherty's argument is unavailing.

In support of her argument, Dougherty cites 42 U.S.C. § 421(h). Title 42 U.S.C. § 421(h)

provides in relevant part:

> An initial determination under subsection (a), (c), (g), or (i) that an individual is
> not under a disability, in any case where there is evidence which indicates the
> existence of a mental impairment, shall be made only if the Commissioner of
> Social Security has made every reasonable effort to ensure that a qualified
> psychiatrist or psychologist has completed the medical portion of the case review
> and any applicable residual functional capacity assessment.

42 U.S.C. § 421(h). Thus, Dougherty is correct when she notes that "'when the record contains

evidence of a mental impairment, the Secretary [now Commissioner] cannot determine that the

claimant is not under a disability without first making every reasonable effort to ensure that a

---

[10] The court recognizes that on remand, in light of the court's finding that the ALJ failed
to accord proper weight to Dr. Gossinger's opinion, the ALJ may choose to alter or revise the
hypothetical presented to the vocational expert. The court is confident that should the ALJ
choose to do so, any altered or revised hypothetical presented will include all of Dougherty's
established limitations.

qualified psychiatrist . . . has completed the medical portion of the case review and any

applicable residual functional capacity assessment.'" *Plummer v. Apfel*, 183 F.3d 422, 433 (3rd

Cir. 1999) (quoting *Andrade v. Secretary of Health & Human Services*, 985 F.2d 1045, 1948

(10th Cir. 1993)) (alterations in original).  However, an ALJ facing evidence of a mental

impairment is afforded more flexibility.  "Because 42 U.S.C. § 421(d), which covers hearings

before an ALJ, is excluded from § 421(h)'s purview, an ALJ is not required to employ the

assistance of a qualified psychiatrist or psychologist in making an initial determination of mental

impairment." *Id.*  When evaluating an alleged mental impairment, An ALJ is entitled to remand

a claimant's case for further review, to call a medical advisor for assistance with the case, or to

proceed with a determination without the assistance of a medical advisor.  20 C.F.R. §

404.1520a(e)(1)-(3).

 The ALJ in this case fulfilled his duty to explore Dougherty's alleged mental impairment.

He considered the following, which constitutes all the evidence of Dougherty's mental

impairments in the record:  Dougherty was prescribed anti-depressant medication by her primary-

care physician, Dr. Sokoloff; Dougherty testified that Dr. Sokoloff provided therapy for her

alleged mental impairments; and Dr. Gossinger refilled Dougherty's depression medication one

time.  In his decision, the ALJ followed the strictures of 20 C.F.R. § 404.1520a in determining

that Dougherty's alleged mental impairments failed to meet or medically equal one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (D.I. 10 at 10-11.)  Then, the ALJ

provided:

> Concerning the issue of mental impairment, the claimant has alleged depression and
> is prescribed psychotropic medications by Dr. Sokoloff, her primary care physician.
> Contrary to offered testimony, there is no evidence that she receives therapy or

counseling from Dr. Sokoloff or any other medical source. Additionally, she has never been referred for mental health evaluation or treatment and regular progress notes offer no insight into the nature of any mental illness. In an overabundance of caution, I accept that her depression is a severe impairment and have accounted for any inherent limitation.

(*Id.* at 14.) Thus, the ALJ afforded Dougherty the benefit of the doubt with regard to her alleged mental impairments. The court finds no error in the ALJ's analysis.[11]

## V.    CONCLUSION

For the foregoing reasons, the court will (1) grant in part and deny in part the plaintiff's motion for summary judgment, (2) deny the defendant's motion for summary judgment without prejudice, (3) vacate the ALJ's decision, and (4) remand this matter to the ALJ for further proceedings consistent with this memorandum opinion.

Dated: May 7, 2010

CHIEF UNITED STATES DISTRICT JUDGE

---

[11] Again, the court recognizes that on remand, in light of the court's finding that the ALJ failed to accord proper weight to Dr. Gossinger's opinion, the ALJ may choose to alter or revise his analysis of Dougherty's physical and mental limitations. The court is confident in the ALJ's ability to do so. The court notes, however, that, should the ALJ decide to reassess such limitations, the assistance of a medical adviser would only clarify and better delineate the severity or lack thereof of Dougherty's alleged mental impairments.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CATHERINE DOUGHERTY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 08-814-GMS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER**

For the reasons stated in the court's memorandum of this same date, IT IS HEREBY

ORDERED that:

1.  The plaintiff's motion for summary judgment (D.I. 13) is GRANTED IN PART

    and DENIED IN PART.

2.  The defendant's motion for summary judgment (D.I. 18) is DENIED without

    prejudice.

3.  The ALJ's February 23, 2008 decision is VACATED.

4.  This matter be REMANDED for further proceedings.

Dated: May 7, 2010

CHIEF UNITED STATES DISTRICT JUDGE